TERMINAL CONSTRUCTION CORPORATION, A CORPORA-TION OF NEW JERSEY, PLAINTIFF-APPELLANT, v. BERGEN COUNTY HACKENSACK RIVER SANITARY SEWER DISTRICT AUTHORITY, A BODY CORPORATE, NOW KNOWN AS BERGEN COUNTY SEWER AUTHOR-ITY, A CORPORATION, DEFENDANT-RESPONDENT.

Argued February 24, 1955—Decided April 25, 1955.

Mr. *Aaron Heller* argued the cause for the plaintiff-appellant (*Messrs. Heller & Laiks,* attorneys).

Mr. *Walter H. Jones* argued the cause for the defendant-respondent (*Mr. Irving C. Evers,* on the brief).

The opinion of the court was delivered by

BURLING, J. This civil action arose out of contract. The specific contract involved was entered into between Terminal Construction Corporation, a corporation of the State of New Jersey (hereinafter referred to as Terminal), and Young Foundation Corporation, a corporation of the State of New Jersey (hereinafter referred to as Young), on the one hand, and the Bergen County Hackensack River Sanitary Sewer District Authority, now the Bergen County Sewer Authority (hereinafter referred to as the authority). The contract, designated as Contract No. 1, was entered into by the parties thereto on August 12, 1949, as a result of competitive bidding. Young subsequently (September 22, 1952) assigned all its rights therein to Terminal, in accordance with their independent agreement of July 5, 1949. Contract No. 1, *ante,* was part of an immense sewage disposal project, known as the Joint Sewage Works for the Overpeck Valley. In the information to bidders 14 contracts were described. Of these 14 contracts, 12 were for various trunk and interceptor sewers together with manholes, meter chambers and appurtenances, and one was for alteration and refitting of the Tenafly, New Jersey, pumping station. Contract No. 1, *ante,* which appears to have been the principal contract of the project, provided for all equipment, materials and work necessary for the construction of the authority's sewage treatment plant in Little Ferry, New Jersey, and its acceptance by the authority in complete operating condition. The structures to be built under Contract No. 1, *ante,* included pump and blower house, screen chamber, grit collector and ejector, primary settling tanks, aeration tanks, final settling tanks, chlorine contact tank, chlorine building and monorail system, "Parshall

Flume," sludge digestion tanks, digester control house, primary sludge pumping station, return sludge pumping station, and pumping station in sludge lagoon, together with garage, underdrains, pipe galleries and piping, open channels, outfall sewer and headwall, landscaping, roadways and walks, outdoor lighting and fencing. It also included all structural steel, electrical, plumbing, and heating and ventilating work in the various structures above described. The bid on Contract No. 1, *ante,* was submitted under date of July 5, 1949, giving an "approximate" total price of $4,246,775.46 (not a binding figure, but expressly described as being merely for the purposes of comparing the bids). The form of contract recited this total price as the "estimated contract amount" and provided for the contractor to "accept as payment in full the summation of products of the actual quantities as determined by the Engineer's estimate, by the unit prices and lump sums bid."

The Overpeck Valley sanitary sewer system and sewage disposal plant were to provide sanitary sewerage disposal for a large area of Bergen County, one of the most populous counties of the State of New Jersey.

As is customary in a major enterprise such as this, detailed and meticulous specifications and terms form part of the contract. Such provisions are usually recommended and drafted by an experienced engineer at the instance of the owner, or sponsor, of the project.

The work to be performed is grounded in the principles of free enterprise and competition. The scope of such an undertaking requires those who accept the invitations to bid to be well versed, or advised, in contract law and forms together with comparable efficiency in accounting and engineering departments. Otherwise their financial doom is spelled. It is common knowledge that the owner, or sponsor, "writes its own ticket" and the competing market of contractors is obliged to bid and perform in conformity thereto, or to avoid that field of endeavor.

However, this does not mean that a contractor is not entitled to enjoy just treatment within the terms of the con-

tract. If it were otherwise the construction of vital public and municipal projects would suffer by the failure of qualified bidders to enter the field for fear of risks beyond those which are foreseeable. It is grave enough to meet calculated risks in good business practice. The public authority which chooses the contract terms is not exempt from the operation of the basic principle of construction of contracts, that where ambiguities exist they are to be taken most strongly against the draftsman. *Jennings v. Pinto,* 5 *N. J.* 562, 569 (1950) ; *Moses v. Edward H. Ellis, Inc.,* 4 *N. J.* 315, 323 (1950).

With this in mind we approach the present controversy. The principal disputes herein arise out of the functioning of the site engineer (*i. e.,* the on-site representative of the engineering firm which was the contract designated engineer), and a meticulous study of the engineer's status, duties and jurisdiction is of infinite importance here.

Contract No. 1, *ante,* including the invitations to bid, clearly contemplated cooperation between contractors engaged on various contract segments of the project. Mutual responsibilities required timing of different phases of the overall operations to mesh the completion of the several elements of the construction most economically and efficiently in the Authority's interests. To keep the work rolling is the objective of the project engineer.

Good and fair engineering practice required definition and classification of the work upon the order for action without waiting until "settlement day." To define or classify the various items of work arbitrarily or grossly negligently to the detriment of a cooperative contractor who desired to expedite and synchronize the performance of his scope of the work with that of other contractors would result in unjust enrichment of the sponsor.

In the last amended complaint filed, and in the answer thereto, it was claimed and admitted that the contract in question was entered into on August 12, 1949. On September 28, 1949, Terminal was ordered by the authority to commence work within ten days as required by Article 34 of the

contract (namely "at such point or points as the Engineer may designate"). The work progressed. There was dispute in the pleadings as to the date or dates of completion. It appears that much of the work was completed by September 1951; but Terminal in February 1952 was still proceeding with the work. The Authority's answer to the last amended complaint filed alleged that Terminal "had by the 11th day of June, 1952, substantially performed most of the physical work specified" in the contract and that on August 1, 1952 the engineer "issued to plaintiff a certificate of substantial completion which was revised August 6, 1952."

Terminal filed its initial complaint herein in the Superior Court, Law Division, on September 10, 1951, but subsequently filed amended complaints. The authority's answer to the last amended complaint was filed September 22, 1952. The Superior Court, Law Division, entered a pretrial order on September 29, 1952. Trial began October 15, 1952. The trial proceedings occupied 19 days, terminating on November 20, 1952, with the verdict of the jury, rendered in favor of Terminal in the aggregate sum of $454,444.32. Judgment was entered on the verdict on November 24, 1952. During the trial, however, the trial court had granted the authority's motion to dismiss two counts of the complaint. Judgment of dismissal of these counts was entered on November 22, 1952. The authority appealed, and Terminal cross-appealed, to the Superior Court, Appellate Division, which reversed the judgment in favor of Terminal and affirmed the judgment of dismissal of two counts of the complaint. Terminal petitioned for certification and the authority joined in the petition for certification, on independent grounds (having the effect of a cross-petition). We allowed certification. *Terminal Construction Corporation v. Bergen County Hackensack River Sanitary Sewer District Authority*, 16 *N. J.* 194 (1954).

## INTRODUCTION

In the present case a synopsis of the pleadings and disposition made of the claims in issue by the trial court and the

Appellate Division is essential to an understanding of the questions involved.

The last amended complaint filed was in five counts, and in each count separate claims were made (none being repeated in any other count).

*The First Count.*

The first count alleged completion by Terminal of its work under the contract "on or about November 1, 1951" and claimed that Terminal was entitled to receive "the full amount due less 2%" which the authority was authorized to hold for a period of one year. This was alleged to be a "total of $4,634,660.43 for specific items of work, labor and material as contracted for on unit prices and bulk bid," with the authority being entitled to credit, for payments on account, $4,247,053.84, and for retained percentage, $92,693.21, a total of $4,339,747.05, leaving a balance of $294,913.38 allegedly due Terminal, and Terminal claimed interest on this balance from December 30, 1951. Terminal alleged the authority "and the engineer as referred to in the contract, willfully, illegally, fraudulently and contrary to the contract, refused to approve payments, all to the damage of plaintiff." The authority denied these allegations; asserted failure of performance by Terminal but admitted substantial completion by June 11, 1952. The authority asserted good faith and admitted liability to the extent of $57,289.60. The pretrial order settled the issues to be tried under the first count as being Terminal's claims relating to earth excavation (a difference[1] of $36,771 being in dispute), earth embankment (a difference[1] of $134,336.25 being in dispute), structural steel (a difference[1] of $8,540 being in dispute) and miscellaneous fabricated steel (a difference[1] of $16,853 being in dispute). The total of these claims under the first count was expressed in the pretrial order as $196,500.25. Against these claims, by way of counterclaim, the authority claimed credit "for

[1]As to each of these items the difference hereinbefore referred to is the amount claimed by Terminal in excess of the amount the authority admitted was due under the contract.

work it had to do and money it had to pay" for repairs and miscellaneous work on the portion of the project covered by this contract. There were 18 such items, a total of $22,273. In addition the authority claimed liquidated damages for 237 days' delay in completion, a total of $23,700. The authority's total claimed credit therefore was $45,973, which it had retained in addition to sums retained for post-completion maintenance.

The claims under the first count were submitted to the jury on the basis of contract liability coupled with fraud. The jury found for Terminal. The Superior Court, Appellate Division, reversed the resultant judgment, and in its opinion directed the trial court on the remand of the matter to strike all allegations of fraud. It further held that, as a matter of law, the first count should have been "dismissed" as to the earth excavation claim; that the earth embankment claim presented a jury question and should be retried; and that the structural and fabricated steel claims should have been dismissed.

*The Second Count.*

The second count of the last amended complaint filed alleged that the authority in violation of Contract No. 1, *ante,* authorized a change in a part of its premises as a result of which a large amount of water from the Hackensack River flooded Terminal's working area, thus necessitating Terminal's expenditure of excess sums of money for performance under conditions which were not normal and did not exist when it undertook the contract; that the authority "by its agent" authorized extra work in this connection, and that for this item Terminal was entitled to damages under the contract in the amount of $216,535.59 with interest from July 1, 1951. Terminal also alleged that the authority and the Engineer "willfully, illegally, and fraudulently, and contrary to the agreement, refused to approve the claim for payment for such work."

These claims were denied by the authority which also asserted that the conditions complained of were caused by

Terminal itself. The opposing contentions were reiterated in somewhat condensed form in the pretrial order. They were submitted to the jury on the contractual basis coupled with the allegations of fraud.

The Superior Court, Appellate Division, held that the pleadings and pretrial order in relation to the second count, termed the "Dewatering Operation," encompassed a jury question as to whether the work in dispute was "emergency" work within the contract, that in event of retrial the jury should be charged that if Terminal should recover any amount on this claim it should be limited to the reasonable value of the services rendered by Terminal (which the authority contended was no more than $20,000, as opposed to Terminal's claim of $216,535.59), and that the issue of fraud in this connection should have been removed from the jury.

*The Third Count.*

Terminal, in the third count of the last amended complaint filed, charged that the authority "by its engineer, did order the plaintiff to perform the wall concrete work, contrary to the contract," causing Terminal to expend excess sums of money, that Terminal completed this work on September 1, 1951, that the authority refused to pay therefor, and that the amount due thereon was $90,000, with interest from September 1, 1951. Fraud was again alleged. The authority denied this claim. The pretrial order recited the opposing contentions of the parties, including the authority's defense that this constituted "Extra Work" for which a written "Extra Work" order was prerequisite.

The trial court granted the authority's motion to dismiss the third count, made at the close of the reception of evidence on the entire case, but the grounds of disposition of the motion are not disclosed. Judgment of dismissal entered in this respect was affirmed by the Superior Court, Appellate Division, on the determination by that court that fraud was an issue to be removed from the jury and that no extra work order was placed in evidence.

### The Fourth Count.

The fourth count was comparable to the third count, except that it related to concrete slab work, and claimed in this respect for Terminal an additional $39,560. The disposition of this count in the pretrial order, on motion to dismiss at the trial level, and in the Appellate Division, paralleled the disposition of the third count, *ante*.

### The Fifth Count.

The fifth count contained claims by Terminal for work done at the authority's and the Engineer's request constituting "changes, additions and modifications of the contract and specifications" completed before December 31, 1951 and for which Terminal claimed $6,023.88 to be due, with interest from December 30, 1951. Fraud was again alleged. The authority asserted that any work performed by Terminal in this respect had been included in the contract items and had been paid for, that no extra work order had been obtained therefor, and that Terminal was precluded from recovery of these items by the "semi-final certificate (of substantial completion)." These opposing contentions were recited in the pretrial order (Terminal's basic claim being recited therein as $4.157.78), and after the trial were submitted to the jury (the trial court's instructions to the jury show the further reduction of this claim to a total of $2,980.55 and the record shows that during the trial some of the original items claimed were voluntarily withdrawn by Terminal). The Appellate Division held that the issue of fraud should have been removed from the jury, and that these items if not included in payments already made were "extra work" items for which no extra work order had been obtained, and therefore the authority's motion to dismiss the fifth count should have been granted.

### SUMMARY OF CLAIMS

The claims of Terminal submitted to the jury (as limited by the pretrial order and the instructions to the jury),

namely, the first, second and fifth counts, totalled $416,016.39. The jury brought in an aggregate verdict on Terminal's claims, in Terminal's favor against the authority, of $414,-257.71.

The verdict also made a special finding that the authority was entitled to a credit of $5,786.39, and under stipulation of counsel the difference between this sum and the sum of $45,973 which had been retained by the authority (in addition to the percentage retained for post-completion maintenance), namely $40,186.61, was added to the judgment in favor of Terminal, bringing the judgment total to $454,444.32. Interest was not specifically mentioned in the verdict and was not adverted to in the questions involved on this appeal.

## THE QUESTIONS INVOLVED

The questions involved in this appeal are complex and repetition thereof verbatim in this opinion would serve no purpose. However the principal reason for reversal expressed by the Appellate Division was that the trial court erred in its instructions to the jury on the subject of agency. Included among the questions involved are the questions whether the Appellate Division correctly determined that the issue of agency of the engineer (namely, whether the engineer was an agent of the authority) was erroneously submitted to the jury, and if so, whether the error was prejudicial to the authority.

Also among the questions involved are questions whether the issue of fraud was properly submitted to the jury; whether in the absence of fraud the judgment should be sustained; whether the construction of various portions of the contract was a matter of law or an issue of fact to be determined by the jury; whether the third and fourth counts of the complaint were properly dismissed; and whether the Appellate Division erroneously decided that the trial court erred in instructing the jury upon the subject of the credits claimed by the authority.

## I. AGENCY QUESTIONS

Adjectively, Terminal's questions involved include the question whether the Superior Court, Appellate Division, departed from the accepted and usual course of judicial procedure by taking cognizance of a question, submission of the issue of the engineer's alleged agency to the jury, in absence of a trial objection thereto, and in absence of assertion of this point by the authority on the appeal to the Appellate Division. Both these adjective elements are refuted by the authority, which calls attention to its broad objections to the trial court's denial of its many requests to charge, and to its "Point VIII" of its brief in the Appellate Division. We find adjectively that the Appellate Division did not err in considering this issue.

Ordinarily blanket objections to a trial court's instructions to the jury are insufficient to constitute a basis for appeal. *Williamson v. Berger*, 11 *N. J.* 500, 505 (1953). In the present case, however, the trial court gave counsel no opportunity to object before the jury retired. And when counsel sought to give reasons for sundry objections to the charge, made after the retirement of the jury, the trial court restricted their opportunity for so doing.

The authority not only objected to the trial court's denial of its several requests to charge (which included: No. 45, the statement that neither Mr. Lincoln nor Mr. Ivan L. Bogert, also a Bogert-Childs representative, had the right under the contract to issue Extra Work orders; No. 46, that the authority was a public body, and could act only by resolution; No. 48, that the engineer had no authority to extend the contract or bind the authority; No. 65, that Bogert-Childs and Mr. Lincoln and Mr. Bogert were not agents of the authority) on the ground that "they are all material," but also objected:

"We take exception as a matter of law, to your Honor's statement that an agent can have apparent authority of a public body. We do not believe that to be a correct statement of the law. We believe that people deal with public bodies at their peril, and we

believe that the law of this state is that it is incumbent upon them to determine the scope of the agency, if, in fact, one does exist. In other words, they have two obligations: to determine whether he is an agent and, secondly, the scope of his agency."

And the authority also stated to the trial court:

"We object, as a matter of law, to your Honor's statement to the jury that there is no difference between a public body and a private body, and that all of the applicable rules of law applicable to private persons are applicable to public bodies and public corporations."

■ Under the circumstances, the failure of counsel to give adequate reasons for their objections, inclusive of the specific reasons asserted on appeal, does not bar the appellate review of the agency question in this case. Such reasons as counsel were permitted to voice after the retirement of the jury, including the reasons hereinbefore quoted, are deemed adequate upon this question, under the circumstances of this case, in the adjective sense. *Cf. Jelinek v. Sotak*, 9 *N. J.* 19, 25–26 (1952).

Insofar as the briefs in the Appellate Division are concerned, the issue of the instructions to the jury on the matter of the engineer's agency seems to have been adequately raised, adjectively speaking.

On the merits in this respect Terminal contended that the submission to the jury of the question whether the engineer was the agent of the authority was proper.

■■ It does not become necessary in this case to consider whether the principles of law relating to implied or apparent authority may be applied in the field of municipal, or public corporations', contracts. The issues here principally relate to construction of a specific building contract, and the general rules of law in this respect are pertinent. We have held in this respect, in *Jennings v. Pinto, supra* (5 *N. J.*, at *pages* 569–570):

"While it is a general rule that the construction of a contract is a question of law for the court, that rule is predicated upon the absence of an issue of fact. Where the effect of a written instrument depends not merely on its construction and meaning but upon

disputed collateral facts *in pais* and extrinsic circumstances, the inferences of fact to be drawn therefrom are for the jury's determination."

The contract designated engineer in the present case seems to have been given a multiple status, being for some purposes, but not for all purposes, the agent of the authority. *Cf. Van Buskirk v. Board of Education*, 78 *N. J. L.* 650, 655–657 (*E. & A.* 1910). That this multiple status was understood by the authority is clearly demonstrable by its choice of contract terms. In the form of contract, Article 1, it expressly provided:

"*Engineer*, or a pronoun in place thereof, shall mean the Bogert-Childs Engineering Associates[2] or their duly authorized representatives, or successors, who are designated by the Authority to perform the duties of the Engineer."

The term "designated," expressed without qualification, may be used for a variety of purposes. It may mean marked, made known or pointed out. See, for example, *State v. Noah*, 20 *N. D.* 281, 124 *N. W.* 1121, 1126 (*Sup. Ct.* 1910); *Colgrove v. United States*, 176 *F.* 2d 614, 617 (*9th Cir.* 1949). *Cf. State v. Green*, 18 *N. J. L.* 179, 181 (*Sup. Ct.* 1840). Or it may be the equivalent of "appointed," *People v. Fitzsimmons*, 68 *N. Y.* 514, 519 (*Ct. App.* 1877), although it may under some circumstances import less stability of tenure than the word "appointed," *Kaplan v. Sullivan*, 290 *Mass.* 67, 194 *N. E.* 721, 723 (*Sup. Jud. Ct.* 1935). *Cf. Hendee v. City of Wildwood*, 96 *N. J. L.* 286, 287 (*E. & A.* 1921). Compare *Morris Tp. v. Washington Heights Development Co.*, 137 *N. J. Eq.* 595, 598 (*Ch.* 1946). It also has the connotation of indicated or set apart for a purpose or duty, such as designation of an officer for a command. *Mutual Discount Corporation v. Nagy*, 111 *N. J. L.* 592, 594 (*Sup. Ct.* 1933). It is clear that in the present contract the engineer was given duties of different characteristics. In some instances he was

---

[2] Bogert-Childs Engineering Associates herein referred to as Bogert-Childs, was a civil engineering firm, a firm of consulting engineers, used by the authority.

appointed as an agent of the authority to make determinations, in others he appears to have been selected as a consultant to make tentative determinations subject to the approval of his principals, and in other provisions of the contract he appears to have been pointed out as an arbiter. These various capacities were consolidated in Article 1 of the contract, as hereinbefore quoted, by the use of the term "designated." The clear intent was to avoid repetition of reference to Bogert-Childs, or its representatives, namely to avoid using specific terms such as appointed (as agent), selected (as consultant) or pointed out (as arbiter). Wherever necessary to the determination herein we shall hereinafter refer to the governing contractual provision or provisions and the construction thereof called for in respect to the status of the engineer in the particular instance.

Pertinent provisions of Contract No. 1, *ante*, which among others control one or more of the issues involved in this case, were as follows:

(Art. 1) "Engineer" means Bogert-Childs "or their duly authorized representatives, * * * who are *designated* by the Authority to perform the duties of the Engineer." (Emphasis supplied)

(Art. 1) "Extra work * * * refers to and includes work required by the Authority, which in the judgment of the Engineer, involves changes in or addition to that required by the plans," etc.

(Art. 1) "Wherever in the specifications or upon the drawings the words 'directed,' 'required,' 'permitted,' 'ordered,' 'designated,' 'prescribed,' or words of like import are used * * * the *direction* * * * of the Engineer is intended, and similarly the words 'approved,' 'acceptable,' 'satisfactory,' or words of like import shall mean *approved* by, or acceptable or satisfactory to the Engineer, *subject in each case to the final determination of the Authority*, unless otherwise expressly stated." (Emphasis supplied)

(Art. 11) The construction program was in the category to be "approved" by the Engineer.

(Art. 14) "Neither the acceptance by the Authority or the Engineer, or any of their agents, employees or subordinates, of the whole or any part of the work * * * shall operate as a waiver of any portion of this contract * * * or of any power or right herein reserved to the Authority or Engineer * * *."

(Art. 17) Damaged work was to be repaired by the contractor to the "satisfaction of the Engineer."

(Art. 29) The engineer was given power to explain the meaning and intent of plans, etc.; to give orders; to determine questions in relation to the construction under the contract—to be final and conclusive upon the contractor "except as provided in Art. 1," *e. g.*, where authority approval was expressly required.

(Art. 36) "Extra Work" could be required by the authority in writing—by methods "approved by the Authority" including a method requiring engineer's determination when "approved by the Authority."

As we have hereinbefore observed, the engineer under the terms of this contract had a multiple status. *Cf. Van Buskirk v. Board of Education, supra.* In some respects the engineer was an agent, in other respects the engineer was a consultant, and in some respects the engineer was an arbiter. Compare *Chism v. Schipper*, 51 *N. J. L.* 1 (*Sup. Ct.* 1888); *Bradner v. Roffsell*, 57 *N. J. L.* 412 (*E. & A.* 1894); *Gerisch v. Herold*, 82 *N. J. L.* 605 (*E. & A.* 1912).

Whether the engineer is an agent, consultant or arbiter depends upon the construction of the pertinent provision or provisions of the contract. Some years ago it was said:

"Engineers have always claimed to be arbitrators between Owner and Contractor, and not the representative solely of one party. This position is a proper one, but to-day it is more of a myth than a fact. The anomalous position is brought about, not because Engineers are desirous of being unfair, but because of the agreements (or contracts) generally used, which make it extremely hard, if not almost impossible, for Engineers to be fair if they try to conform to the agreement provisions." *Bamford, Agreements for Building Contracts* (1910), *p.* 450 (Reprinted from *Transactions, vol.* LXVII, *p.* 438 *et seq.* (1910))

In *Parker and Adams, The A. I. A. Standard Contract Forms and the Law* (1954), *p.* 54, it is pointed out that:

"An analysis of the General Conditions will show that in a large proportion of them a definite duty is laid upon the Architect, in performing which he is acting for and on behalf of the Owner as his agent in some technical matter."

Many of these instances are demonstrated in the above mentioned treatise. There are also contract provisions adverted

to therein which are arbitration clauses. *Id., p. 55 et seq.* Compare *Architect's Certificate as a Condition of Payment,* 185 *L. T.* 336 (1938). The provisions of a contract may clothe an architect with the status of adviser, of agent of the owner, or of arbitrator. See American Institute of Architects, *The Handbook of Architectural Practice* (1943), *ch.* 8, *pp.* 19, 20; *ch.* 33, *Art.* 38–*Art.* 40, inclusive, *pp.* 59, 60.

▉ The situation disclosed by the pleadings and proofs herein was of considerable complexity. The trial court should have instructed the jury as to the various capacities of the engineer under portions of the contract respectively pertinent to the individual counts and claims of the complaint. If there then remained a disputed question of fact which would result in the invoking or disregarding of a particular clause of the contract in reference to the agency question, that dispute of fact should have been left to the jury. See *Jennings v. Pinto, supra.*

▉ The trial court's instructions to the jury on the subject of agency are concerned in the reversal by the Superior Court, Appellate Division. The appellate court held that neither Bogert-Childs nor Mr. Lincoln nor Mr. Ivan L. Bogert was an agent of either Terminal or the authority, but either (as the engineer) was an independent arbiter and that the trial court issued conflicting and erroneous instructions on this subject. The Appellate Division pointed to the trial court's emphasis on Article 29 of the contract, the trial court's recitation of the opposing contentions of the parties, its failure to instruct the jury whether Mr. Lincoln or his employer, Bogert-Childs, occupied the status of agent of the authority, and its denial of a request to charge, made by the authority, that Mr. Lincoln and Bogert-Childs were not its agents. The Appellate Division and the trial court were both in error. As hereinbefore observed, the engineer under a given circumstance may have been an agent of the authority; under other circumstances the engineer may have been a consultant, or an arbiter. The trial error was the failure to construe the contract and instruct the jury on the alter-

natives, if any, open to determination on the facts with regard to agency. This error may not cause reversal of the trial court's judgment, however, unless it was prejudicial to the substantial rights of the authority. The effect of the error may be determined only after a construction of the contract as applied to each of the three counts (first, second and fifth) of the complaint which were submitted to the jury.

## II. Fraud Issues

The Superior Court, Appellate Division, in effect reversed the trial court's judgment and disposition of the issues in this matter, upon the determination by the Appellate Division that there was no evidence of fraud introduced in support of the allegations of the complaint as incorporated in the pretrial order. Necessarily included in the questions involved on the present appeal is Terminal's question whether the issues of fraud were properly submitted to the jury.

■ Adjectively the Appellate Division appropriately observed that specification of fraud is required under *R. R.* 4:9–1. This rule (formerly *Rule* 3:9–1, which applied at the time of the complaint in this case) reads:

"*In all averments of* misrepresentation, *fraud,* mistake, breach of trust, *willful default* or undue influence, *particulars of the wrong, with dates and items if necessary, shall be stated so far as practicable * * *.*" (Emphasis supplied)

The importance of compliance with *R. R.* 4:9–1, *supra,* is obvious. The effect of noncompliance with *R. R.* 4:9–1, *supra,* on the course of trial and judgment was discussed in detail in *Schlossberg v. Jersey City Sewerage Authority,* 15 *N. J.* 360, 369–372 (1954).

The default charged to the authority and to its alleged agents. consultants or arbiters is fraud in the sense in which it is coupled substantively to the law of enforcement of construction contracts, the general category with which we are here concerned.

■ Engineer control provisions in this field of construction contracts are regarded as dispositive of disputes

between the parties in the absence of clear proof of fraud upon the part of the engineer. *T. Foster Callahan, Inc., v. Comm'rs, etc., Union Twp.,* 102 *N. J. L.* 705, 706–707 (*E. & A.* 1926). Proof of fraud in this respect may not be rested upon mere divergent statements of facts, made by an arbiter in his certificate of completion and by the party against whom it issues. *Landstra v. Bunn,* 81 *N. J. L.* 680, 685 (*E. & A.* 1911). And it has been held that to instruct a jury that if they find an architect withheld a completion certificate without substantial reason, they may find fraud, is erroneous. *Bradner v. Roffsell, supra* (57 *N. J. L.,* at *pages* 416–417). In the *Bradner* case, however, it was observed that if the architect had been the *agent* of the owner, he might have bound his principal by direct action or by ratification by conduct. *Id., page* 419. We are not faced in the present matter with the mere withholding of a completion certificate. In fact, the parties stipulated at the trial in the present matter that Terminal's action was not barred by the completion certificate provisions of the contract. The issues in the present matter depend upon the status of the engineer and whether his or its performance of his or its various duties under the contract, and the authority's acts in the premises, were sufficiently pleaded as fraudulent under *Rule* 3:9–1 (now *R. R.* 4:9–1), *supra.*

We are of the opinion that acts or inaction of the engineer in exercise of authority vested in him or it by the owner under the contract is denominated fraudulent in the legal sense where the engineer's act or inaction was arbitrary and without reason, and that this rule applies even where the owner was not a direct participant in the engineer's fraud. *Rizzolo v. Poysher,* 89 *N. J. L.* 618, 625 (*E. & A.* 1916). In this we are in accord with the expression of law made by the Superior Court, Appellate Division, in the present matter that:

"Fraud in this connection has a broader connotation than is ordinarily implied. In addition to its ordinary significance, in con-

struction contracts it includes *arbitrary action and gross mistake.*
9 *Am. Jur., Building and Construction Contracts,* § 34; *Restatement of the Law, Contracts,* § 303."

The philosophy of the law in this respect has been stated to be: "If the engineer has acted in good faith after fair investigation of the facts, the courts give conclusive effect to his decision as the parties agreed." 3 *Corbin on Contracts* (1951), *sec.* 652, *p.* 600. It has been said that the decided cases are generally in accord, and that if the architect or engineer has acted fradulently or has committed a gross mistake the contractor is entitled to payment. *Grismore on Contracts* (1947), *sec.* 164, *pp.* 252–253. *Cf. Massman Const. Co. v. Lake Lotawana Ass'n,* 240 *Mo. App.* 469, 210 *S. W. 2d* 398, 402 (*Ct. App.* 1948).

The underlying rationale of this philosophy of constructive fraud is that in determinations under this type of contract the "high point in the Architect's (or engineer's) practice of his profession" lies in those instances "when in order to do justice to the Contractor he has to oppose the desire of his employer, the Owner." Parker and Adams, *The A. I. A. Standard Contract Forms and The Law* (1954), *p.* 54. It has been said that the architect or engineer occupies a position of trust and confidence, and that "he should act in absolute and entire good faith throughout," and that when he acts under a contract as "the official interpreter of its conditions and the judge of its performance" he should "side neither with the Owner nor with the Contractor" but exercise impartial judgment. *American Institute of Architects, The Handbook of Architectural Practice* (1943), *ch.* 8, *pp.* 19, 20; *ch.* 48, *p.* 81.

As an example of the application of the philosophy of constructive fraud, it was said in *Duval County v. Charleston Engineering & Con. Co.,* 101 *Fla.* 341, 134 *So.* 509, 514 (*Sup. Ct.* 1931), that it is "generally held that construction contracts cannot leave the arbitrary or fraudulent decision of an architect or engineer or the like to operate as a conclusive settlement of matters in controversy." And the

Iowa Supreme Court in *Littell v. Webster County*, 152 *Iowa* 206, 131 *N. W.* 691 (1911), modified on other grounds and petition for rehearing overruled, 132 *N. W.* 426 (1911), held (131 *N. W.*, at *page* 697):

"* * * the contractors cannot be deprived of their rights through the failure of the engineer to act, nor should they be defeated by his fraud or through his collusion. And doubtless capricious or arbitrary action on his part will be sufficient upon which to predicate a finding of fraud * * *."

However, it does not follow *ipso facto* that this constructive fraud philosophy was not adequately pleaded in the five counts in the amended complaint last filed by Terminal in this action. Each count alleged the facts concerning each item in dispute, and many of the items were stated in minute detail; the contract terms were alleged; Terminal's performance was alleged; the acts of the authority and of the engineer were alleged; and the refusal to approve the specific items, or to pay therefor, was alleged in terms in which the charge of arbitrary determination by the authority and the engineer is clearly spelled out. The particulars of the constructive fraud alleged therefore seem to have been "stated so far as practicable" under former *Rule* 3:9–1 (now *R. R.* 4:9–1), *supra*. Further the pretrial order demonstrates that this was the theory of the case in the incorporation therein of the terms "arbitrarily" and "grossly negligently" in conjunction with the charging phrase "wilfully, illegally, fraudulently, and contrary to the contract." Our goal in the administration of the adjective law is to reach substantial justice.

There remains the question whether there was any evidence of "arbitrary action" or "gross mistake" to come within the definition of law of constructive fraud in building contracts hereinbefore discussed. This may not be treated generally, but must be determined separately with respect to each of the individual claims advanced in the five counts of the last filed amended complaint.

## Course of Submission of Agency and Fraud Questions to the Jury

Patently this case called for particular disposition of various disputed issues by the jury, where submission was proper. In the absence thereof in this case, we are posed with the difficulties of severability of the verdict. Terminal contends that some of the counts, in which the principal elements of recovery were advanced, are uncontroverted in quantity and therefore the judgment may be molded. Of this, more will be said.

It is observed that severability would be a simple matter in a complex case of this character, where money damages alone are sought, each different count claiming a separate sum, had the trial court, at or independent of the request of counsel, applied either former *Rule* 3:49–1 (now *R. R.* 4:50–1) or former *Rule* 3:49–2 (now *R. R.* 4:50–2). This case was ripe, at the trial level, for resort to either the method of special findings or the method of general verdict together with written interrogatories upon the several issues of fact.

Special verdicts and interrogatories contain many valuable potentialities. See *Abbott's Civil Jury Trials (Viesselman, 5th ed. 1935), ch. XXVII, pp. 951 et seq.* One of the functions of special verdicts is to aid in the disposition of a case on review proceedings. They permit use on such review of special findings in the appellate courts in immediate disposition without the necessity of a remand for a retrial of all issues, or at least a reduction of the retrial to the portions of the judgment affected by the error. They enable errors to be localized so that the sound portions of the verdicts may be saved. 3 *Moore's Federal Practice* (1938), sec. 49.01, p. 3097.

However, our disposition of this case on this appeal does reduce to a minimum of fringe items the elements of the case which will require a retrial.

### III. The First Count

In the first count of the complaint, as contained by the terms of the pretrial order, Terminal sought the difference, at the contract (and bid) unit rate, between sums stated by it and sums determined by the engineer, for bulk items, namely earth excavation, earth embankment, structural steel and fabricated steel. The issues of agency and fraud were left to the jury and the Superior Court, Appellate Division, held that this was error. The questions involved include the questions whether either the trial court or the Appellate Division erred in this respect under the pertinent principles of law, hereinbefore discussed.

In respect of agency in this matter, while Mr. Ivan L. Bogert was chosen by Bogert-Childs as the "project engineer" and remained such during the entire conduct of the work, its employee, Mr. Robert A. Lincoln was "resident engineer," *i. e.*, "the engineer in charge of the field at the job." The authority does not deny that Mr. Lincoln was a duly authorized representative of Bogert-Childs. As such, Mr. Lincoln's services in relation to the project were performed as "Engineer," under the definition of that term in Article 1 of the contract.

*Earth Excavation Claims.*

It seems to be undisputed that the earth excavation claim did not entail, or was not premised upon contentions of, extra work or changes in or addition to that required by the plans, specifications and addenda to the contract.

Terminal's earth excavation claim, reduced to basics under the constructive fraud philosophy of the law hereinbefore discussed, essentially was that the engineer (*i. e.*, Bogert-Childs or its duly authorized representatives) arbitrarily refused to approve the excavation figures submitted by Terminal. (We do not overlook the testimony directed at Mr. Lincoln's personal ethics, but find it at the most a mere scintilla of evidence, unimportant under the circumstances relative to this claim.)

The contract contemplated that work should be done at the "direction of the Engineer" (General Provisions, sect. G2). The "Detailed Specifications" expressly covered "Earth Excavation" in section 1 thereof. "Sect. 1.5" expressly provided that "Excavations shall be made to the lines approved by the Engineer which shall be of sufficient width outside the structures to give room for forming the pipe joints, or for placing and removing forms for concrete * * *," and "Sect. 1.6" expressly provided "(a)11 excavation carried beyond the lines and grades shown on the drawings or established by the Engineer, together with its disposal shall be at the Contractor's expense * * *." These are examples of provisions of the specifications pertinent to excavation claims. The form of contract required the contractor, *inter alia*, to confine "the operations of his workmen to limits indicated by * * * directions of the Engineer" (Art. 52). Article 33 was of similar import and provided "(a)ny work improperly done without lines or levels or instructions shall be removed and replaced by the Contractor at his own expense." Article 11 of the Form of Contract gave the engineer control over the actual operations, and Article 7 thereof clearly indicated that the contractor was to accept orders from the engineer. This was also clearly expressed in Articles 1 and 29. In the latter article it was also provided that the engineer "shall determine in all cases the amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for."

These examples of the contractual commitments of the parties demonstrate that in respect to the earth excavation claim Terminal was entitled to binding instructions to the jury to the effect that Bogert-Childs, Mr. Ivan L. Bogert and Mr. Robert A. Lincoln were agents of the authority, but that Bogert-Childs acted in the capacity of arbiter in the matter of the final recomputation of the earth excavation item. Therefore the trial court erred in leaving that issue to the jury on this claim, but the error favored the authority and was therefore not prejudicial to the substantial rights of the authority.

Insofar as the alleged arbitrary (constructively fraudulent) determination as to cubic yards of material excavated is concerned, measurement was detailed in "Sect. 1.16" of the "Detailed Specifications." The testimony points to a dispute of fact as to the actual excavations, and if the facts as testified to relating to the monthly estimates of completed work controlled a jury question as to the arbitrary character thereof would be present. There was ample testimony from which a jury could find that Bogert-Childs, Mr. Ivan L. Bogert or Mr. Lincoln arbitrarily cut back the completed work estimates to conform to the pre-bid estimates of the authority's engineers. It is to be noted that a perpendicular excavation of the specific space would have required the expense of shoring, whereas the method pursued by Terminal was less onerous and provided fill for other uses.

However, the Appellate Division determination in this respect did not rest on the cut-back factor, but upon the *final* decision of Bogert-Childs as to the total cubic yardage of excavation for which payment should be made. Terminal has made no effort to repudiate the findings of the Appellate Division, namely that near the completion of the work Mr. Lincoln asked his superiors for a recomputation of the excavation work, that a surveyor, Mr. Florio Job, who had performed the pre-bid surveying work on which the bid proposals for excavation were based, made a complete survey of the area, and that another Bogert-Childs engineer, using Terminal's preexcavation survey and Mr. Job's field notes recomputed the actual excavation amounts, bringing the allowance to 87,064 cubic yards (11,064 cubic yards more than the original pre-bid estimate of 76,000). No evidence is disclosed from which it could be inferred that this recomputation was arbitrary, and under the contract terms it was binding upon Terminal. Mere disagreement will not justify the submission of the issue of fraud, *i. e.*, constructive fraud as hereinbefore set forth, to the jury. *T. Foster Callahan, Inc., v. Comm'rs, etc., Union Twp., supra* (102 *N. J. L.*, at *pages* 706–707).

For the reasons hereinbefore stated we are of the opinion that the Superior Court, Appellate Division, cor-

rectly determined that it was error for the trial court to deny the authority's motion to "dismiss" the earth excavation claim incorporated in the first count. At the stage of the case when the motion was made, it called for partial judgment at the trial for the defendant authority on this item. *R. R.* 4:55–2 (formerly *Rule* 3:54–2).

## Earth Embankment Claim.

Included in the first count of the complaint was Terminal's claim for earth embankment work that is, a disputed portion thereof being an amount of additional fill used to complete embankment to the required level as a result of subsidence of the original surface of the ground upon which the embankments were constructed. The dispute, and the questions involved, gravitate to the construction of the pertinent contract terms. For instance, Mr. Ivan L. Bogert testified that there was no dispute as to whether there had been a sinking of the original ground, and that tests ordered by the engineer confirmed this, these tests being paid for by the authority. The engineer had "denied that they (Terminal) were entitled to payment because of that (the subsidence of the original surface)."

The complaint, the pretrial order and the trial of the plaintiff's case proceeded on the theory that there was no ambiguity in the contract. The defense appears to have taken a like course. Terminal had called a witness who testified that the original surface was "organic bog," that the whole embankment sank because the subsurface pushed out. Testimony of witnesses for the authority to the effect that the subsidence was due to Terminal's own conduct, raised a jury question as to the cause of sinking of the embankment.

The contract specifically referred to settlement of embankments in the following terms in the "Detailed Specifications":

"Sect. 3.5. *Settlement.* The Contractor shall provide additional material as required to compensate for settlement of embankments.

Sec. 3.6. *Measurement.* The quantity to be measured for payment under Item 3 shall be the volume of compacted embankment *between the original surface and the payment lines shown on the drawings*

*ordered.* No allowance will be made for materials in excess of the requirements, or for material which has settled. Surplus earth from excavations utilized to fill over pipe lines to an ordered elevation above the original ground surface, and around manholes and meter chambers on the sewer lines, and at other locations designated by the Engineer, where no compacting by trucks or rollers is required, will not be measured for payment under Item 3." (Emphasis supplied)

It developed at the trial that the crucial issue on this claim was whether measurement for payment purposes ran from the pre-work level of the original surface, or from the level at which the original surface finally rested.

Mr. Lincoln, as a witness for the defendant authority, testified (over Terminal's objection to the effect that the contract language was clear) that it was proper from an engineering standpoint to say that where the subsoil had settled there had been settlement of the embankment. In rebuttal Terminal called an expert witness who testified that "settlement of an embankment that has been built, in engineering terminology, is consolidation due to compressive forces of working over the surface, the way the material itself, where the particles become more closely engrained in settlement, where compaction results," and that where the subsurface settles, carrying the embankment with it, such is not a "settlement of the embankment." The authority objected to this line of questioning as improper rebuttal and on the ground that the construction of the contract terms was a matter for the court. The trial court overruled these objections, and we think, properly so.

In this respect the authority on this appeal invokes the doctrine that the rebuttal opinion evidence was inadmissible because it constituted a reliance on custom and was not so pleaded. *Johnson v. Hoffman*, 7 *N. J.* 123, 133 (1951). In the *Johnson* case, *supra*, we held that the requirement for pleading custom "is particularly true where the custom is relied on to aid in the interpretation of the contract or to explain the terms of the contract, where permitted under the parol evidence rule." *Ibid.* It is not necessary to decide whether the testimony as to engineering

terms would ordinarily be excluded in the absence of pleading the included matter as a "custom." The record here patently discloses that the testimony of Terminal's witness in this respect was rebuttal to direct testimony of a witness of the authority. In this light also, even if error existed, it may not be claimed as prejudicial by the authority, inasmuch as the authority itself created the trial course. On the merits of this item of claim, the matter of construction is a question ordinarily exclusively for the trial court. The following excerpt from Mr. Justice Heher's opinion in *Atlantic Northern Airlines, Inc., v. Schwimmer*, 12 *N. J.* 293, 301–302 (1953), is clearly pertinent herein:

"Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose. *Casriel v. King*, 2 *N. J.* 45 (1949)."

Application of the principles hereinabove quoted from the *Atlantic Northern Airlines, Inc.*, case, *supra*, calls for a determination by the court that the subsidence of the original surface was contemplated by the contracting parties (due to the nature of the ground) and that the use of the word "original" established the liability of the authority to pay for fill required to compensate for such subsidence. Subsidence is a movement of the soil from its "natural," *i. e.*, original, position by shifting, falling, slipping, seeping or oozing. *Levi v. Schwartz*, 201 *Md.* 575, 95 *A.* 2*d* 322, 326, 36 *A. L. R.*

2d 1241 (*Ct. App.* 1953). *Cf.* 4 *Restatement, Torts, sec.* 817. Such a condition was demonstrated without contradiction in the present case. The use of the word "compacted" in the contract clauses in question indicates the nature of "settlement" which the contractor was to rectify at his own expense.

However, explanation of the contract and determination of amounts for which Terminal was to be paid thereunder, was delegated by the contract to the engineer. The action proceeded upon the constructive fraud theory as hereinbefore defined. The crux of this issue is, therefore, whether the engineer acted arbitrarily in this respect. Where such clauses exist in contracts, the contractor is bound by the engineer's decision unless it appears "to have been arbitrary or made in bad faith." *Benjamin Foster Co. v. Commonwealth,* 318 *Mass.* 190, 61 *N. E.* 2d 147, 151, 166 *A. L. R.* 925 (*Sup. Jud. Ct.* 1945). The engineer as a matter of law— by virtue of construction of the contract—on this phase of the case occupied an independent status of an arbiter, to explain the contract. The trial court should have so instructed the jury, but no prejudice to the authority appears to exist from the submission of the issue to the jury. The principles of constructive fraud, for that is the category in which our courts of last resort have considered the effect of completion certificates which are forms of engineer control, apply to the engineer's conduct *as* an arbiter as hereinbefore discussed.

There is evidence in the case from which it might be inferred that the engineer acted arbitrarily, independent of the testimony relative to engineering use of the term "settlement." In this sense, evidence of constructive fraud and willful breach of contract was present in sufficient quantity and quality to support the submission of the embankment claim to the jury. We find no error prejudicial to the substantial rights of the authority therein.

In summary, we find that the Superior Court, Appellate Division, erred in holding that the embankment claim was improperly submitted to the jury.

*The Structural and Fabricated Steel Claims*:

There remain in connection with the first count Terminal's claims for payment of disputed items of structural and fabricated steel by bulk. The engineer, as hereinbefore mentioned, had the power to make necessary explanations as to the meaning and intent of the specifications and drawings; to the amount, quality, acceptability and fitness of the work and materials to be paid for; and to "decide in all cases every question which may arise relative to the fulfillment of this contract."

As hereinbefore determined, these provisions were binding upon the contractor in the absence of proof of constructive fraud, namely, arbitrary action on the part of the engineer.

Evidentiary support for this claim is lacking. Not only does the contract support the engineer's ultimate treatment of these items from the viewpoint of judicial construction of contracts, but there is no evidence from which it may be inferred that the engineer's decisions in reference to these items were arbitrary or the result of gross mistake. Those decisions were binding on Terminal in the absence of proof of constructive fraud as hereinbefore discussed. *T. Foster Callahan, Inc., v. Comm'rs, etc., Union Twp., supra* (102 *N. J. L.*, at *pages* 706–707); *Benjamin Foster Co. v. Commonwealth, supra* (61 *N. E. 2d*, at *page* 151). The mere fact that there was evidence that other determinations by the same representative of Bogert-Childs, *i. e.*, by the engineer, were arbitrary does not supplant the necessity for introduction of evidence that their determinations as to these items of claim were arbitrary.

The Appellate Division correctly determined that the trial court should have granted the authority's motion for judgment, made at the close of the reception of evidence, in reference to the structural and fabricated steel claims. *R. R.* 4:55–2 (formerly *Rule* 3:54–2), *supra*.

## IV. THE SECOND COUNT

Insofar as the questions involved relate to the claims advanced in the second count of the complaint, the questions

328

again assert the agency and fraud issues hereinbefore discussed, and our general determinations thereon are to be applied.

Again we are called upon to construe the pertinent specific provisions of the contract.

This count is identified as the claim for "dewatering" operations. During the course of the entire project construction, a faulty construction by the contractor holding Contract No. 6 (construction of a "60-inch sewer extending from the screen chamber at the sewage treatment plant in the Borough of Little Ferry, beneath the Hackensack River to a point west of the track of the New York, Susquehanna & Western Railroad in the Borough of Ridgefield") caused difficulties by flooding through installations in the Contract No. 6 area and by failure to connect properly with the installations on Terminal's portion of the entire project. The resident representative of Bogert-Childs, namely Mr. Lincoln, issued a memorandum on August 3, 1950, which called upon Terminal to reconstruct the terminal portion of its neighbor's work and in connection with this state of events Terminal was required to effect a considerable amount of additional pumping to remove water from the scene of these particular operations.

Article 39 of the form of Contract required Terminal to relocate or reconstruct *its own* construction which endangered adjacent construction; it authorized Terminal to claim damages from an adjacent contractor but not from the authority. However, it did not bar a claim by Terminal against the authority for work done to repair or relocate an adjacent contractor's installations, and Article 40 authorized Terminal to claim (against the authority) "compensation. for any damages sustained by reason of the acts of the authority, or its agents * * *." Power to act in the premises was also given the engineer and Terminal in the following clause:

"Art. 55. *Power of Contractor to Act in an Emergency.* In an emergency threatening injury to persons or damage to the work or any adjoining property, the Contractor may act, to prevent such

threatened injury or damage, and will so act if instructed or authorized by the Engineer. The amount of reimbursement merited by the Contractor on account of any such action shall be determined by the Engineer."

The evidence indicates that there was an abnormal water seepage through the Contract No. 6 installations from as early as December, 1949, that Terminal complained of it and Mr. Lincoln was aware of it. Terminal did not sue for pumping necessitated by such seepage but only for dewatering in the Contract No. 6 installation area after August 3, 1950. There was evidence that Terminal treated the subsequent condition as an emergency situation, developing from the operations required by the engineer under Mr. Lincoln's August 3, 1950 directive to perform work on the Contract No. 6 installation and his orders from time to time during that work. Mr. Ivan L. Bogert testified that emergency pumping equipment and crews were customarily kept at cofferdam operations. He further testified that "we did not deny" the water came from contract No. 6. He had been advised that a "serious amount of water was coming out of contract 6 installation" as early as July 27, 1950. He and Mr. Lincoln testified they approved substantial bills for work done under the August 3, 1950 order above adverted to.

Mr. Lincoln testified that Terminal's pumping was necessary for it to handle the water to enable Terminal to perform its work under the August 3, 1950 directive, that the engineer made no other recommendation for handling the water and was satisfied with the methods employed by Terminal. There is evidence that the authority itself was aware of the situation. Mr. Lincoln never disputed the amount of the bills for this work as such. He testified that the total amount of the bills was $216,535.59 and they contained complete itemization.

There seems to have been an emergency situation. The engineer had the power to act as the authority's agent in this respect. The submission to the jury of the issue of the facts that would be the basis of a finding of an emergency by the engineer enured to the benefit of the authority.

The authority contended that the total dewatering claim in question was not entirely related to the alleged emergency situation but was due at least in part to other conditions on which the evidence was in dispute. The authority also contended that the engineer had no power to order Terminal to reconstruct adjoining installations. Article 3 of Contract No. 1 directed the contractor (Terminal) to "leave intact the work of adjoining contractors, *unless otherwise ordered by the Engineer.*" (Emphasis supplied) Terminal was also not responsible for damage caused by agents of the authority (Article 41).

There was a further defense of the authority that payment should be denied because this was work done under an extra work order that required written approval by the authority. The "Extra Work" clause, Article 36 of the Form of Contract, upon which the authority relies, claiming the engineer had no power to order Terminal to do the work covered by this count, without written approval of the authority, related to major and material additions or changes to the items involved in Contract No. 1, not to adjacent portions of the overall project. Although not properly a defense to be submitted to the jury, the trial court did so on the constructive fraud basis both as to Mr. Lincoln's and Bogert-Child's conduct in refusing to submit the specific bills to the authority and as to the authority's conduct in the premises with notice and knowledge of the situation. No prejudice was done to the authority and as a result of the verdict of the jury no harm was done to Terminal.

In addition the authority contended that the engineer determined the amount merited by Terminal to be $20,000, and that this was binding on Terminal under the provisions of Article 55 of the contract. Under all the evidence, including evidence that Mr. Lincoln ordered emergency work, approved the fact of work done and cost thereof, and calculated the total as $216,535.59 from records kept by his own assistants, it was for the jury to say whether the engineer's allowance of approximately one-tenth of what his own figures showed to be reasonable was arbitrary on his part.

The submission to the jury of the claim under the second count was not prejudicial to the authority. The jury could have determined the extrinsic facts, in relation to constructive fraud, in relation to construction of the contract (see *Jennings v. Pinto, supra*), or in relation to Terminal's alleged responsibility for creation or avoidance of the situation. There was therefore an area of decision in which the jury might have found for the authority on the evidence.

The authority on this appeal contended that the emergency theory of this claim was "advanced by the Appellate Division." The record does not support this contention. The record demonstrates that the emergency theory was tried. The non-existence of an emergency was part of the trial course of the authority. Further the instructions of the trial court to the jury submitted the claim for dewatering operations, referred to the contract as being designed to reach "every contingency that might arise," discussed the second count at length including Terminal's allegations that an emergency existed and the authority's contention that "no emergency, in fact, existed." Terminal's 24th request to charge was pertinent and was charged. The authority's request No. 43 was charged, and it was favorable to the authority.

After the jury retired, the authority made a blanket objection to refusal of the trial court to instruct the jury on several of its requests to charge and these requests indicated its awareness of the emergency question. The pertinent requests (including No. 59, No. 61, and No. 66) were either adequately covered by the general instructions to the jury or called for binding instructions which would have been opposed to the evidence. Further, the authority expressly objected to the submission of the emergency issue to the jury, on the ground that there was no evidence relative to an emergency in fact. We find no merit in that objection. There was no error prejudicial to the authority in the instructions to the jury and in the trial court's disposition of the requests to charge, in regard to this subject matter.

The essence of the controversy on the second count is whether the engineer's determination as to the amount merited

by Terminal was fraudulent on the theory hereinbefore discussed. The fraud issue is inextricably interwoven with the engineer's conclusions as to the scope of the work in its relationship to "Emergency" work within the terms of the contract, i. e., to test the validity of his allocation, and warrants its submission, as was done, to the jury. Article 55, hereinbefore quoted, authorized the engineer to determine the amount of compensation to be paid to Terminal for this item of claim. There is sufficient evidence to also present a jury question, and it was so submitted, whether the engineer's action in setting the amount of payment for this work was arbitrary and therefore in the sense of the authorities hereinbefore discussed, constructively fraudulent. As hereinbefore noted, the engineer confirmed the actual value of the work performed and materials furnished, in the amount claimed by Terminal.

We find no error on the part of the trial court in the submission of the second count to the jury, including the issue of fraud. Fraud in the sense here applicable is inseparable from the entire claim under this count.

## V. THE THIRD AND FOURTH COUNTS

Terminal in the third and fourth counts sought damages for alleged fraudulent (arbitrary) action of the engineer in requiring Terminal to construct concrete wall work and concrete slab work "contrary to the contract and to plaintiff's schedule of operations." The trial court dismissed these counts on the authority's motion after the entire reception of evidence. R. R. 4:55-2 (formerly Rule 3:54-2), supra, and the Appellate Division affirmed.

We are of the opinion that the evidence on this phase of the case disclosed no more than a mere difference of opinion as to the proper spacing of construction joints. Under Article 29 of the Form of Contract the Engineer's determination was binding upon Terminal in the absence of proof of

arbitrary, or fraudulent, conduct on its (or his) part. No evidence of arbitrary or grossly mistaken conduct referrable to these claims was introduced. A plaintiff's recovery of damages may not be based upon conjecture and speculation. *Cf. Stanley Co. of America v. Hercules Powder Co.*, 16 *N. J.* 295, 312 (1954).

For the above reasons we are of the opinion that the Appellate Division did not err in affirming the dismissal of the third and fourth counts.

## VI. The Fifth Count

 In the fifth count of the last amended complaint Terminal sought payment for 14 items of modification in the work (which are relatively insignificant and may be termed "fringe" items), ordered either by Mr. Lincoln as resident engineer, or by Bogert-Childs directly and through Mr. Ivan L. Bogert as project engineer. By process of elimination and withdrawal during the trial these items were reduced to 7, which were submitted to the jury (Terminal claiming $2,980.55 therefor) on the theory of breach of contract coupled with constructive fraud as hereinbefore discussed.

With respect to this count the questions involved also principally relate to the agency and fraud issues, but as a result of the apparent applicability of certain provisions of the contract in addition to provisions hereinbefore mentioned our task of determination is more difficult.

In their direct application to the fifth count the questions involved raise the questions whether the Appellate Division erred in construing the contract as a bar to this count because no written "Extra Work" orders were obtained and in determining that if there was constructive fraud, such fraud would not have a material bearing upon Terminal's "known duty" to obtain written "Extra Work" orders.

On the items claimed under the fifth count with which we are concerned on this appeal, there was evidence of extrinsic circumstances which raised fact issues for the jury to decide,

if the contract requires a construction obviating written "Extra Work" orders signed by the authority, of which more will be said.

First, the contract provisions:

Article 1 of the Form of Contract, as hereinbefore discussed, made Bogert-Childs, Mr. Lincoln and Mr. Ivan L. Bogert, or any one of them, the engineer under the contract. Article 1 also provided:

> "*Extra Work*, as used herein, refers to and includes work required by the Authority, which *in the judgment of the Engineer*, involves changes in or addition to that required by the plans, specifications and addenda in their present form." (Emphasis supplied)

Article 3 of the Form of Contract was entitled "Scope of the Work" and, *inter alia*, required Terminal to furnish labor, tools, materials, etc., to "do all work including extra *and additional* work and pay all costs incidental thereto" (emphasis supplied); to "bear all losses due to the nature of the work and cost incidental to suspension or discontinuance of the work, *except as herein provided*" (emphasis supplied); to "undertake all cutting, fitting, or patching of his work required to bring it into conformity with the contract documents"; and to "perform and complete the work in the manner best calculated to promote rapid construction and consistent with safety to life and property to the satisfaction of the Engineer, and in strict accordance with the contract documents * * *."

The construction program was controlled by the engineer under Article 11. Article 20 clearly demonstrated that the "estimated quantities of the several classes of work and kinds of materials stated in the Form of Proposal" were only designed for the purpose of comparing bids and were not binding even if "any of the estimated quantities be found not even approximately correct."

Under Article 29, the engineer was given broad powers, including among others hereinbefore adverted to the power to "give all orders and directions contemplated under the contract."

Article 35 provided:

"*Minor Changes in Plans.* The Authority reserves the right to make minor changes in the location, line, grade, plan, form and dimensions of the work, or any part thereof, either before or after the commencement of construction. Such minor changes shall not warrant any claim for damages on the part of the Contractor through consequent increase or decrease of quantities in any items of the work. *If such changes increase the amount of work to be done, the Contractor will be entitled to* an extension of time and to *additional compensation under the various contract items affected,* or if mutually agreeable, *under the Extra Work clause of the contract.*" (Emphasis supplied)

Article 36 provided:

"*Extra Work.* The Authority may at any time, by a written order, and without notice to the sureties, require the performance of such Extra Work or changes in the work as it may find necessary or desirable * * *."

Article 36 then proceeded to set up three methods for determining the amount of compensation to be paid the contractor, *i. e.,* Terminal. The three methods were: (a) "By such applicable unit prices, if any, as are set forth in the contract"; or (b) if not set forth in the contract, by such unit prices or lump sum "mutually agreed upon by the Authority and the Contractor"; or (c) upon a third basis, which may be adverted to in the vernacular as "cost plus" provisions, provided that *if the work were done under the third method* "no such order for work or materials so issued by the Authority shall be valid unless first approved and countersigned by the Authority."

Major changes in plans could be made as "Extra Work" or as the subject of supplementary contracts under Article 37.

Compliance with "instructions of the Engineer" was made mandatory by Article 53(f).

The provisions of the contract papers, including those which we have hereinbefore selected as being the more descriptive ones, clearly demonstrate and require the following construction: the authority contemplated the possibility of

four classes of changes (excluding those due to emergency which are otherwise expressly dealt with in the contract), namely: (a) minor changes not entitling the contractor to additional compensation; (b) minor changes and minor additional work not constituting material alterations in the project but entitling the contractor to additional compensation; (c) major changes ordered in writing for which the contractor could be paid (as change orders or as "Extra Work" orders) either under the contract or under mutual agreement or on a "cost plus" basis; or (d) extraordinary alterations in the project, which might be made the subject of supplementary contract.

The evidence would support the inference that the items claimed by Terminal under the fifth count fall in either the second or the third category above outlined. The contract clearly made the engineer the authority's agent in all these matters of classification except for approval of work to be done on the "cost-plus" basis. This is not only indicated by the final sentence of Article 36(c), *ante*, but is clearly contained in the power vested in the engineer to give all orders contemplated under the contract (Article 29, *ante*) and the requirement for the contractor to comply with all instructions of the engineer (Article 53(f) *ante*).

It necessarily follows that upon the agency question the trial court should have instructed the jury that the Engineer was the authority's agent in giving change and "Extra Work" orders, except on the "cost plus" basis. This indicates error in the trial court's charge as it related to the fifth count. For the reason that the trial court's charge on the agency issue was favorable to the authority (*i. e.*, that the jury could have determined under the charge that the engineer was not the authority's agent), the error was not prejudicial to the authority.

There remains the question involved whether the trial court erred in submitting the issue of fraud, *i. e.*, constructive fraud as hereinbefore discussed, to the jury in respect to the seven claims remaining under the fifth count. These seven claims must be considered individually within the

frame of the pertinent contract provisions and the law as hereinbefore set forth.

The broad powers given to the engineer, both as agent and arbiter, throughout the contract papers establish the fact that the engineer was the judge of the character of specific work ordered, that is, whether it was contract covered, a minor immaterial change, minor material change, major change, or "Extra Work." The engineer had the authority to issue any order, except an order contemplating "cost plus" extra work orders. There is no dispute in the evidence as to the fact that the engineer ordered the work done in the seven instances for which Terminal's claims under the fifth count were submitted to the jury.

(a) The plaintiff's evidence as to an equipment bases item of $266.76 was weak, and seems to have presented no jury question as to fraud since it pointed to a mere difference of opinion rather than arbitrary or grossly negligent determination on the part of the engineer.

(b) In respect to the reinforcing steel item of $861.12, the plaintiff's evidence was also weak, but presented an issue of extrinsic fact for the jury to determine. If the facts were as indicated by the defendant (namely that Terminal disregarded the engineer's instructions and thus made the additional expense necessary), there was a mere difference of opinion as to whether Terminal was entitled to be paid; if the facts were as represented by Terminal, the evidence supports an inference of arbitrary determination sufficient to present a jury issue.

(c) The concrete bracket claim, $280.83, was not supported by proof of arbitrary action, but the evidence submitted by the plaintiff indicates that this claim was included in the payments already made to Terminal.

(d) A hardware item of $229.17 was supported by evidence from which arbitrary action on the part of the Engineer could be inferred and was therefore properly submitted to the jury.

(e) In respect to Terminal's claim for $350.91 for fuel oil meters, the evidence admits of no inference of arbitrary action

on the engineer's part but on the contrary indicates that no additional expense was suffered by Terminal. At most there was evidence of a mere difference of opinion, which, under the authorities hereinbefore discussed, did not support its submission to the jury.

(f) The evidence introduced by the plaintiff on a metal water stop claim, $758.78, likewise raised no reasonable inference of arbitrary determination on the part of the engineer and should not have been submitted to the jury.

(g) Finally, with respect to a brick skylight item of $232.98, the inference of arbitrary determination by the engineer was reasonably raised by the evidence and presented a jury issue.

To recapitulate, claims for $758.78, and for $266.76, $280.83 and $350.91 (the latter three summing up to $898.50), a total of $1,657.28, should not have been submitted to the jury but should have been eliminated from the case by the trial court on the authority's motion. See *R. R.* 4:55–2, *supra*. In this respect it is noted that the jury verdict was less than Terminal's claims by $1,758.78, indicating that the jury itself eliminated the items which should have been withheld from its consideration.

## VII. The Authority's Counterclaim

The authority counterclaimed for $45,973 as a credit for damages for delay ($23,700) and for expenses allegedly incurred by the authority in repairing breaks, backfilling and other miscellaneous expense (in all $22,273). The authority does not deny that a jury question was presented but contends that the trial court's charge was confusing and contradictory in this respect.

The trial court initially instructed the jury as to the authority's claims and to Terminal's defenses (a) that it was not responsible for these items, which included pipe breakage (a total of $13,295.15), other miscellaneous repairs, extra prints of contract, drawings, heating, etc., and (b) that if it were responsible for the pipe breakage, those specific items

should be excluded from the case as referrable to the moneys retained for maintenance. It subsequently charged the authority's 32nd request as follows:

"Number 32: Under the terms of the contract, the obligation to repair pipe breaks was imposed upon the plaintiff and if it did not discharge this obligation, the Engineer was authorized to deduct the cost of the eleven pipe breaks and backfilling as set forth in the certificate of substantial completion from moneys otherwise due plaintiff."

The trial court shortly thereafter charged the jury to determine whether the $45,973 claimed as credits was a proper deduction in whole or in part and later "* * * We want your finding as to whether or not the Bergen County Sewer Authority should be allowed the whole amount of that claim, $45,973, or any portion of it," and asked a special verdict of the amount to which the defendant should be allowed "for those credits."

Counsel for the authority acceded to the statement by Terminal's counsel made during this colloquy between the trial court and counsel, that:

"It is understood and agreed by the Court and counsel that when the jury makes its findings as to the amount of credits, if any, that the defendant is entitled to, then, in that case, the difference between the amount of the credit and $45,793 will be added to the judgment of the plaintiff."

 Under these circumstances we are of the opinion that if any error existed in the charge as it related to the credit claimed by the authority it was not prejudicial to the substantial rights of the authority, and in the absence of any indicia of objection thereto at the trial level and in view of the stipulation of counsel disclosed, the Appellate Division erred in reversing the judgment on this phase of the case.

### SUMMARY

For the foregoing reasons it is determined:

A: That the following claims were properly submitted to the jury:

First Count—earth embankment claim only;

Second Count—"dewatering operations";

Fifth Count—items of reinforcing steel, hardware, and brick skylight.

B: That the trial court erred in denying the authority's motion to dismiss the following claims:

First Count—earth excavation claim and bulk steel claims;

Fifth Count—items of equipment bases, concrete brackets, fuel oil meters and water stops.

C: That the trial court's dismissal of the third and fourth counts was proper.

D: That there was no prejudicial error requiring reversal in the trial court's charge upon the question of credits allowable to the authority.

In respect to the determination by the Superior Court, Appellate Division, it is determined:

A. there was error in the Appellate Division's construction of the contract and its conclusions of law in respect to the issue of the engineer's status as agent of the authority or arbiter between the parties to the contract;

B. the Appellate Division correctly determined that arbitrary action or gross mistake on the part of the engineer would constitute fraud in the sense in which that term was pleaded in the present case;

C. the Appellate Division correctly affirmed the trial court's dismissal of the third and fourth counts.

The multiple issues involved, and the incidental marshalling and presentation of evidence in this case entailed a lengthy trial at considerable expense to both parties; the processing and conduct of the review proceedings in the Superior Court, Appellate Division, and in this court were likewise.

The philosophy of the present *Rules Governing the Courts of New Jersey* is to provide the vehicle whereby prompt and substantial justice may be reached. In accomplishment of this paramount objective we have an example on this appeal which affords us the opportunity to resort to the procedural avenues provided.

Review on civil appeals under *R. R.* 1:5–3(*b*) is provided as follows:

"(b) Neither error in the admission or the exclusion of evidence, nor error in any ruling or order or in any action taken or omitted by the court, any administrative agency or public official or by any of the parties, nor any other matter, whether or not involving the exercise of discretion, shall constitute ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment, order or determination, unless a denial of the relief sought appears to the court to be inconsistent with substantial justice."

In addition we are constitutionally empowered to exercise original jurisdiction insofar as it "may be necessary to the complete determination of any cause on review." *N. J. Const.* 1947, *Art.* VI, *Sec.* V, *par.* 3.

In respect to appellate courts it is said:

"A reviewing court, when remanding a cause for a new trial, where error exists as to only one or more issues, may likewise limit the trial to issues affected by the error whenever these issues are distinct and severable." 39 *Am. Jur.*, *New Trial*, *sec.* 21, *p.* 45.

*Cf.* 3 *Am. Jur.*, *Appeal and Error*, *sec.* 1226, *p.* 724; *Harris, Pleading and Practice in New Jersey* (*rev. ed.* 1939), *sec.* 665, *pp.* 660–661. It has been said that "the overriding policy [under our present practice] would appear to be that no case is to be remitted to the trial court if the Appellate Court is capable of concluding the controversy." *Schnitzer, The New Practice* (1949), *p.* 337.

▮ If the question or issue with respect to which the verdict or judgment is wrong is fairly separable from other issues, and the best interests of justice will be served by granting a partial new trial, the judgment may be set aside as to those issues affected by the error and preserved as to the issues not so affected. *Cf. Kress v. City of Newark*, 8 *N. J.* 562, 576 (1952); *Rempfer v. Deerfield Packing Corp.*, 4 *N. J.* 135, 149 (1950); *Paolercio v. Wright*, 2 *N. J.* 412, 417 (1949); and *Esposito v. Lazar*, 2 *N. J.* 257, 259 (1949). Compare *Kelly v. Hoffman*, 9 *N. J. Super.* 422, 432 (*Law Div.* 1950).

### CONCLUSION

Applying the principles of severability of issues for retrial, and for the adjective and substantive reasons hereinbefore set forth, the judgment of the Superior Court, Appellate Division, is modified to conform to this opinion. Accordingly, the judgment of the Superior Court, Law Division, is set aside but the verdict is preserved in part as hereinbefore set forth. The matter will be remanded to the Superior Court, Law Division, for entry of judgment on the verdict for the plaintiff, Terminal Construction Corporation, in the amount of $350,871.84 on its complaint and $40,186.61 under the trial stipulation of counsel in reference to the credit claimed by the defendant, the Bergen County Sewer Authority; judgment for the defendant authority, dismissing the claims for excavation, structural steel and fabricated steel as claimed in the first count of Terminal's complaint, dismissing the third and fourth counts of Terminal's complaint, and dismissing the fifth count of Terminal's complaint as to all claims thereunder except the reinforcing steel, hardware and brick skylight claims. As to the latter three claims under the fifth count a new trial is ordered.

Costs of the printing of the record shall be divided equally between the two parties; each party will pay its own costs in all other respects.

WILLIAM J. BRENNAN, JR., J. (dissenting, in part). I join in the conclusions except as to the reinstatement of such part of the judgment as covers the claim for earth embankment and the dewatering operations which together total $350,871.84.

### I.

The contract plans or drawings showed the lines of the earth embankments plaintiff was to build, and plaintiff bid accordingly. They were compacted embankments in layers not exceeding 12 inches in thickness to be constructed by

approved means and to be rolled by tractors, bulldozers or by traffic, as approved by the engineer. But the specifications provided that as to any embankment "the quantity to be measured for payment under Item 3 shall be the volume of compacted embankment between *the original surface* and the payment lines shown on the drawings ordered." The embankment which is the cause of the dispute was constructed of earth fill laid on the original surface of the ground. That ground was swampy, boggy and soft, a fact known to the parties and the engineer before the contract was entered into in August 1949. It appears from Exhibit P-24 that a cross-section map of the site as of October 1, 1949 was made by plaintiff and approved by the engineer with elevations noted thereon showing the original grade of the site. When the embankment was completed Exhibit D-56 was prepared by the engineer as of April 15, 1952 showing the original grade of the site according to P-24, the finished grade of the embankment and the side slopes shown on the contract drawings. The engineer approved payment for the cubic yards of compacted fill within the embankment so delineated.

However, before the embankment was completed the original surface gave way when the subsoil pushed out under the weight of the embankment. The plaintiff was therefore under the necessity of supplying fill to replace the compacted material which had dropped down with the original surface. It is the subsided cubic yardage of compacted embankment which was not approved for payment by the engineer which is the subject of the earth embankment claim.

The engineer's decision was based upon his interpretation of the specifications. He interpreted them to provide that plaintiff was to be paid only for the volume of compacted embankment between the original grade of the site as established by the elevations shown on P-24 and the payment lines shown on the drawings. The specifications provide expressly that "no allowance will be made * * * for material which has settled" and "The contractor shall provide additional material to compensate for settlement of embankments."

It was the engineer's duty under the contract to interpret the specifications for the parties. Article 29 provides that "The Engineer shall make all necessary explanations as to the meaning and intent of the specifications and drawings * * *," a provision familiar in contracts of this type. The parties usually bind themselves to accept the decisions of the engineer upon the numerous questions of interpretation and application inevitable in the construction of a large project. Such provisions have been found to be essential to the orderly progress of the work and to secure flexibility in adapting means to ends. Courts will pass upon an engineer's decisions only within very narrow limits; so long as they are made within the framework of the contract the courts will not disturb them in the absence of a showing that they are arbitrary or capricious, or tainted by compulsion or moral fraud. As the majority opinion states, "Engineer control provisions in this field of construction contracts are regarded as dispositive of disputes between the parties in the absence of clear proof of fraud upon the part of the engineer."

The narrow issue controlling the disposition of this claim is whether the engineer's decision was arbitrary or capricious in interpreting "original surface" as he did rather than as original surface where it finally came to rest when carried down with the embankment. Unless there is evidence supporting an inference of arbitrary or capricious action in making the interpretation the parties, and the courts, are concluded by the engineer's decision. The charge of plaintiff that the engineer acted deliberately and maliciously in bad faith finds no support in the record, as the Appellate Division and the majority also agree.

The Appellate Division considered that there was evidence sufficient to raise a jury question of arbitrary or capricious action in the testimony of plaintiff's expert witness. That expert's opinion was that the authority's obligation to pay for "compacted embankment" included any such embankment sinking with the original surface, because the clauses excluding payment for "material which has settled" and for "settlement of embankments" meant, under accepted trade usage,

not the settlement of the subsoil carrying the compacted embankment with it, but settlement within the compacted embankment itself. But it is not made to appear in any wise how contraction, through trade usage, of the ordinary meaning of the words "settlement of embankments" operates to enlarge the ordinary and usual meaning of the words "original surface." At all events, that opinion is plainly insufficient to evidence arbitrary or capricious action on the part of the engineer in relating original surface to the original grade of the site as established by the elevations taken from the 1949 cross-section map.

My colleagues do not rely upon this expert's opinion to raise the question. Their conclusion is rested upon the evidence that the parties and the engineer all knew when the contract was entered into that the ground was an "organic bog" presenting the danger of subsidence. This extrinsic evidence of the knowledge of the parties at the time they made the contract is held to illumine the parties' meaning and, it is said, "calls for a determination *by the courts* that the subsidence of the original surface was contemplated by the contracting parties (due to the nature of the ground) and that the use of the word 'original' established the liability of the Authority to pay for fill required to compensate for such subsidence." (Italics mine) I respectfully suggest that the only permissible consideration the court may give this evidence is as to the reasonableness of the significance attached to it by the engineer, that is, whether the engineer was arbitrary in inferring from the contractor's knowledge of the condition that the contractor undertook the risk and made the contract well knowing the surface might subside and that if it did the contractor was obliged without compensation to provide "additional material as required to compensate for settlement of embankments." What the court has done, I submit, is merely to substitute the court's conclusion of the significance to be given the extrinsic facts for the engineer's decision as to the significance to be attached to them, although certainly his conclusion is equally reasonable and plausible. We thus convict the engineer not of an ar-

bitrary or capricious interpretation but of arriving at a construction contrary to that which we would reach if we were free to construe the specifications in the first instance. This, in my view, is an excess of our judicial function in light of the parties' own act in establishing, so to speak, their own court of last resort to decide such questions.

I would set aside the Appellate Division's judgment remanding the issue for a new trial, and direct the entry of judgment in favor of the authority upon the claim.

## II.

The dewatering operation claim relates to work done by plaintiff in pumping water after August 3, 1950 from the site of the pump and blower house which plaintiff constructed at a point some 200 feet from the west bank of the Hackensack River. The plaintiff's president, Dinallo, testified that before he bid on the job he examined the site and saw that "the entire site was one mass of swamp."

It was established by plaintiff's own evidence that the pumping of some water was inevitably necessary under the best possible construction conditions; and plaintiff concedes the expense of doing such work was included in its bid price. The terrain was such that the cofferdam method of construction was the only practical method. This is a method employed when water conditions are encountered. A cofferdam is simply a steel-sheeted boxlike structure which serves to hold back water and earth from an excavation in which construction work is carried on. Originally plaintiff's contract gave it the option of using the open cut or the cofferdam method. Early in the winter of 1950, before the development of the trouble giving rise to the claim, the engineer called for discussions of the option because of his opinion that the open cut method was impractical. The discussions resulted in a supplemental written agreement of April 14, 1950 under which plaintiff surrendered its option and agreed to proceed by the cofferdam method, employing a subcontractor for the purpose. It was not until June 10, however, that the name of the subcontractor was submitted for approval, and

not until June 27 that the work of sinking the cofferdam was started.

The pump and blower house included a screen chamber wet-wall section 38 feet below the surface. Plaintiff was to sink the cofferdam walls on the north, south and west sides of the area to be excavated for the chamber, and the north and south cofferdams were to be connected with a cofferdam forming the east wall. The last-mentioned cofferdam had been driven nine months earlier, in September 1949, by another contractor, Greenland & McCullough. That contractor had laid a 60-inch trunk sewer 35 feet under ground from the point where the east wall was to be located, the sewer running east of that point under the Hackensack River to a point beyond the river. The sewer was ultimately to connect with the east wall of the screen chamber. Between that wall and the river, a distance of 200 feet, the sewer pipe lay upon a stone gravel bed and the trench was filled in on top with porous dirt fill.

Greenland & McCullough commenced their work by digging a trench from the site of the east wall toward the river. They lined the trench with cofferdams. The work began just before or at about the time plaintiff received its contract in August 1949. Seeing that Greenland & McCullough were working from the site of the wall toward the river, plaintiff immediately complained to the engineer that the operation prevented plaintiff gaining access to the site and that unless Greenland & McCullough were ordered to work elsewhere, trouble might develop making it difficult for plaintiff to tie up with the east wall cofferdam. The engineer did not agree with plaintiff's contention, but he had Greenland & McCullough take some steps to avoid difficulties. Plaintiff remained dissatisfied, and the engineer became apprehensive that something untoward might indeed happen if plaintiff did not promptly start work on the site to effect the earliest possible connection with the trunk sewer. He testified that he continually "from the early part of the job, requested and pleaded with Mr. Dinallo to commence his main cofferdam before anything happened." The dispute was not resolved,

and plaintiff proceeded with other operations and, as stated, did not start the screen chamber work until June 27, 1950.

Plaintiff proceeded with other work adjacent to the power house site. As early as March Dinallo protested that water was coming on the site in huge quantities through the Greenland & McCullough fill on top of the trench, and on July 27 he protested that a "big blow" of water had come from that place. But plaintiff undertook the necessary pumping operations to remove the water, and makes no claim for reimbursement of that expense.

The dispute arises from the happenings on and after August 3. The east wall cofferdam driven by Greenland & McCullough had shifted. There seems to be no disagreement that the engineer, Lincoln, accurately explained the reason for the mishap when he testified that it "stood all that time [nine months] in very treacherous ground." The situation presented problems for both the plaintiff and the engineer. The problem for the plaintiff was whether the north and south walls of the cofferdam could be connected with the east wall in its shifted position. Plaintiff apparently decided that the connection could be made. But the engineer's concern was more grave. He was fearful that, the wall having shifted, the 60-inch sewer 35 feet under the ground might have shifted also and created the necessity of re-doing some of the sewer work, or that plaintiff's attempt to drive cofferdams tieing into the shifted cofferdam might result in breakage of the sewer pipe. He therefore concluded, after consultation with his superiors, to take the safe course and have the Greenland & McCullough cofferdam by-passed and such of the sheeting as was necessary for the purpose pulled out. He gave plaintiff a writing for that work, dated August 3, 1950 and reading as follows:

"FIELD MEMORANDUM TO: Terminal Construction Corporation
Subject: Construction of Steel-sheeted cofferdam around the screen chamber-wet wall section of Pump & Blower House.

1. You are hereby directed to proceed with the construction of the steel-sheeted cofferdam denoted above pursuant to your written agreement with the Bergen County Sewer Authority.

2. You are also directed to extend your cofferdam across the front of the existing cofferdam constructed under Contract No. 6 at the entrance of the 60″ trunk sewer to the screen chamber without connecting to the existing sheeting, but removing such portions of said sheeting as may be required for clearance, and as approved by the undersigned. You will also place such temporary timber bulkheads, sheeting and bracing as may be required to retain the existing embankment and materials around the 60″ trunk sewer, and as approved by the undersigned.

3. Work listed in paragraph No. 2 above, other than that required by your agreement with the Bergen County Sewer Authority for the construction of the steel-sheeted cofferdam, and consisting essentially of the removal of portions of the existing steel sheeting and bracing of fill, will be approved for payment by the undersigned as extra work; the amount of compensation to be pursuant to Article 36 (c) of the Contract and as approved by the Bergen County Sewer Authority.

ROBERT A. LINCOLN<br>
Robert A. Lincoln<br>
Resident Engineer<br>
Bogert-Childs Engineering Associates."

The plaintiff's cofferdam, including the work called for by the memorandum of August 3, was completed on September 26, 1950. Lincoln, the engineer, computed the amount plaintiff was entitled to under the memorandum at $20,469.72, covering "labor, insurance on labor, rental of equipment, fuel, electricity, overhead and profit." But plaintiff demands $216,535.39, claiming that the excess over the engineer's allowance represents the cost of removing water from the excavation after August 3.

My colleagues conclude that Article 55 of the contract governing work done by the contractor "in an emergency" supports plaintiff's claim. I understand other bases upon which the claim is asserted are found to be without merit under the contract, and with that conclusion I am in agreement. But I see no support in the emergency clause for the claim.

If plaintiff is to recover on the theory that the additional water plaintiff pumped out was an emergent condition, its burden of proof necessarily required a showing that the water condition was "an unforeseen occurrence; a sudden and urgent occasion for action," *The American College Dictionary* (1948); "an unforeseen combination of circumstances which

calls for immediate action," *Webster's New International Dictionary* (*2d ed.*). But plaintiff's president, Dinallo, testified that he had predicted at the very outset of the job, when he protested allowing Greenland & McCullough to proceed first, that what occurred would happen. And Dinallo also dated the trouble from March 1950 when he first wrote the authority about it. Thus it was neither "unforeseen" nor "sudden," but anticipated and existing for almost five months before August 3. If the engineer erred in not stopping Greenland & McCullough when plaintiff protested and that error of judgment led to the condition (I cannot find that either fact is supported in the evidence), nevertheless plaintiff does not seek to hold the authority to account by reason of that error of judgment but upon the premise of an "unforeseen" and "sudden" event, which the proofs irrefutably show was not at all the case. And it must be noted that nothing in Article 55 gives the engineer power to declare an emergency. Where an emergency in fact is encountered, the contractor, on his own or upon instruction and authority of the engineer, may do the work necessary to meet it. Where the authority denies, however, that there was an emergency, the contractor must prove that one existed, whether the work he did was done upon his own decision or upon the direction or authority of the engineer.

And, at all events, the claim is that the dewatering was done as part of the work ordered by the memorandum of August 3. There is not the barest suggestion in that memorandum of any dewatering work. In words that import no ambiguity whatever the memorandum directs plaintiff "to extend your cofferdam across the front of the existing cofferdam * * * without connecting to the existing sheeting, but removing such portions of the sheeting as may be required for clearance * * *. You will also place such temporary bulkheads, sheeting and bracing as may be required to retain the existing embankment and materials around the 60″ trunk sewer * * *." And it makes crystal clear that this is the only additional work to be paid for, defining the work to be approved for payment as that "consisting essentially of the

removal of portions of the existing steel sheeting and bracing of fill * * *." That is the precise work which the engineer computed entitled plaintiff to compensation of $20,-469.72, and plaintiff does not question the reasonableness of the allowance in that regard.

Finally, the extension of the north and south walls of plaintiff's cofferdam across the front of the Greenland & McCullough cofferdam, and the incidental removal of sheeting from that cofferdam, did not let in the flood of water of which plaintiff complains. That condition, to Dinallo's knowledge, began at least in March, several months before. The source of the water was finally and definitely established in the spring of 1951; it came from the river because of faulty construction of the trunk sewer by Greenland & McCullough which permitted the water to run from the river through the gravel bed on which the pipe lay and the porous fill on top of the pipe. The contract, in Article 39, expressly bars any action against the authority in such cases but leaves the contractor to his remedy against the other contractor. The article provides that no action may be brought against the authority for damages suffered from an "act or omission" of another contractor and that "This contractor shall have no claim against the Authority for such damages but shall have a right to recover such damage from the other Contractor." Plaintiff early suspected that faulty work on the part of Greenland & McCullough caused the trouble, and served notice on them of intent to hold them responsible in damages. But Greenland & McCullough failed financially, and so the claim was not pressed against them but is now asserted against the authority.

I would reverse the judgment of the Appellate Division remanding the issue for a new trial, and direct the entry of a judgment for plaintiff in the amount of $20,469.72 on this count.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, BURLING and JACOBS—4.

*Dissenting in part*—Justices WACHENFELD and BRENNAN—2.